Hillsborough,
No. 4210.

RICHARD L. BURGESS *v.* BOSTON & MAINE RAILROAD.

Argued October 6, 1953.

Decided December 21, 1953.

*Wyman, Starr, Booth, Wadleigh & Langdell* (*Mr. Langdell* orally), for the plaintiff.

*McLane, Davis, Carleton & Graf* and *Stanley M. Brown* (*Mr. Brown* orally), for the defendant.

GOODNOW, J. The public highway over which the crossing in question passes is a twenty-four foot blacktop highway. It is known as Route 114 and is the main highway between Manchester and Goffstown. Both the highway and the tracks run in a generally east and west direction in the vicinity of the crossing. The course of the highway for one traveling from west to east is substantially straight for over five hundred feet before the crossing and turns somewhat to the right or south immediately beyond the crossing, the angles of intersection and the degree of turning being indicated by the fact that as the south rail of the track and the north side of the highway converge going easterly they form an angle of about 28 degrees while the north rail and the south side of the highway, as they separate still going easterly form an angle

of about 17½ degrees. The crossing itself is level and the highway approaches to it vary from that level to a maximum of only two feet within five hundred feet of the crossing in either direction. The driver of a vehicle approaching from the west has an unobstructed view of 434 feet to the east down the track beyond the crossing when he is 200 feet distant from the crossing and this unobstructed view continues to the crossing, increasing in distance as the crossing is approached. Because of the angle at which the highway and the track cross, the view of a highway traveler to the east is largely available without the necessity of the driver's turning his head. For a traveler going easterly there was a customary cross-buck warning sign on the lefthand side of the road just beyond the crossing. At a point about 275 feet west of the crossing there was a circular black and yellow advance warning sign on the south side of the road and at about the same distance from the crossing the letters RR were painted on the surface of the road.

The motor vehicle which the plaintiff was operating in an easterly direction and of which he was the only occupant was a dual-wheel one ton Ford truck with a normal load consisting of automotive equipment. It was in excellent condition and the brakes were good. The train which was traveling westerly was a local freight, consisting of a steam engine, seven cars and a caboose, which ran over this route three days a week at unscheduled hours. Both the train and the truck approached the crossing at about twenty-five miles per hour. The headlights of the truck were lighted. The plaintiff, aged forty, had been operating motor vehicles for over twenty years. His truck collided with the side of the locomotive about six feet from the front at the location of the cylinder cocks. As a result of his injuries, the plaintiff suffered a loss of memory of the events immediately preceding the accident.

In connection with the defendant's claim that its motion for a directed verdict should have been granted, the record discloses that there was evidence on which the defendant could be found negligent. On the plaintiff's claim that the defendant failed to sound the whistle and bell of the train for the crossing, the testimony was in conflict, with considerable direct evidence in addition to that of members of the train crew that the signals were given. In support of the plaintiff's claim that such was not the case, however, there was positive evidence given by one witness who was also traveling

easterly and who was a few hundred feet ahead of the plaintiff as he passed over the crossing. This witness testified that he knew of the crossing, that he listened but heard no signals as he approached and crossed it, that when he was about 125 feet beyond the tracks he observed the train approaching some 600 feet from the crossing and that at no time was any whistle blown. The claim was further supported by witnesses living about 600 feet east of the crossing who testified that their dogs customarily howled in a particular manner when the train whistled and that they had not so howled immediately before this accident, a fact which they realized a few minutes after the collision when they were informed of its occurrence. This was sufficient evidence on which the jury could find the defendant negligent in this respect. *DiPrizio* v. *Railroad*, 98 N. H. 254, and cases cited.

A similar situation existed as to the plaintiff's claim that the headlight of the train was not lighted as it approached the crossing. Here again, there was direct testimony by the engineer that he had turned on the light before the accident occurred, that it was not damaged in the accident and that it continued to be lighted while the train was stopped and as it later backed up toward Manchester. Aside from the fireman, no one else who saw the train before the accident testified that the light was either on or off. The track west of the crossing was straight and the front of the train was approximately 570 feet westerly of the crossing when it came to a stop. The headlight shone ahead of the engine 700 to 800 feet if on bright and 200 to 300 feet if on dim. While there was no direct testimony that the light was not on as the train was stopped west of the crossing, several witnesses testified that they looked in a westerly direction up the track from the crossing and from a nearby house and either saw no "light shining ahead down the railroad track" or saw no lights showing from the train. As affecting visibility, the defendant points out that the cylinder cocks of the engine had been damaged in the collision, allowing steam to escape around the engine. The effect of this escaping steam upon the view available to these witnesses went to the weight to be given to their observations but did not nullify them as a matter of law. The witnesses living 600 feet easterly of the crossing noticed the train as it backed up toward Manchester a couple of hours after the accident and testified directly that there was no light showing on either end of the train. From this evidence that the light was then off, in contradiction of the testimony of the defendant's

engineer that it remained on at all times and was on as the train backed up, coupled with the testimony of the witnesses as to a lack of light showing from the train when it was stopped, it was findable that the light had not been on at the time of the accident.

It was also findable that the light of the train was on at the time of the accident and the plaintiff claimed, if such was found to be the fact, that the defendant was negligent in not furnishing some special protection at this crossing. The basis of this claim was that the broad angle at which the train from the east approached the traveler from the west combined with the somewhat parallel course followed by highway travel from the east created a situation requiring such protection in that a traveler from the west during dusk or darkness would be likely to be confused between the light of the train and those of oncoming motor vehicles.

Since the decision in *Stocker* v. *Railroad,* 83 N. H. 401, it has been well recognized in this state that a railroad is required to provide special protection at a crossing only when such special and unusual dangers exist at the particular crossing as to reasonably require that protection. *Gillingham* v. *Railroad,* 91 N. H. 433, 437, 438; *Despres* v. *Railroad,* 87 N. H. 427. In support of a claim that such a duty exists, it must appear not only that the particular danger was of such a nature that the railroad was reasonably required to anticipate and know of its existence but also that "special features of pertinent bearing" indicated a reasonable need of special protection. *Stocker* v. *Railroad, supra,* 405. The danger complained of in this case is that of confusion which is claimed to exist only during dusk or darkness when the approach from the east of a lighted train coincides with the approach of a motor vehicle from the west. There was no evidence that the defendant had been put upon actual notice that highway travelers might be misled under this particular set of circumstances. Considering the broad, unobstructed view available for 200 feet west of the crossing, the relative height of a locomotive headlight as compared with that of motor vehicle lights traveling on substantially the same level of approach to the crossing and the modest speed at which the train customarily traveled, it is doubtful that the evidence would even support a finding that the railroad should have known of the danger which is claimed to have existed at certain times and under certain conditions at this crossing.

Assuming that the railroad could be required to have recognized this particular danger, we turn to the special features and facts

connected with this crossing to determine whether it could be found that a reasonable need of special crossing protection existed. The highway at this crossing was of blacktop construction twenty-four feet in width and was substantially level with the crossing for at least 500 feet on each side of the crossing. The view of the track to the east for a traveler from the west was wide open and unobstructed. The highway traffic, at best, was not continuous in both directions although "there is hardly ever a time but what there is a car going by or coming down." The only train then operated over this line was the local freight involved in this accident which made three trips a week, at a customary speed of twenty-five miles per hour and at unscheduled hours which were sometimes in daylight and sometimes in dusk or darkness. The statutory cross-buck warning sign was in position at the crossing and at a distance of 275 feet west of the crossing a disc sign beside the road and the letters RR painted on the highway surface gave advance warning of the crossing. Perils which may arise only infrequently to change an otherwise proper crossing to one of particular hazard are not necessarily special and unusual dangers within the meaning of the rule. *Chevalier* v. *Railroad*, 89 N. H. 367, 369. The particular coincidence which is said to produce the peril complained of in this case could occur only so rarely that it cannot be said, in the light of the use made of the crossing by highway travelers and the railroad, that reasonable care required the railroad to furnish any protection at this crossing beyond that required by statute. The defendant's exception to the submission of this issue to the jury must be sustained and a new trial ordered.

In support of the defendant's motion for a directed verdict emphasis is placed on the claim that the plaintiff was contributorily negligent as a matter of law. It is argued that the plaintiff either saw the train and was negligent in proceeding into the crossing or did not see the train because he was careless in the manner he looked for it. If this conclusion were compelled by the evidence, the defendant would be entitled to a directed verdict. *Bixby* v. *Railroad*, 94 N. H. 107. We are of the opinion, however, that it is not. The fact that there were no physical obstructions to the plaintiff's view of the track upon which the train was traveling during the last 200 feet of his approach to the crossing, does not necessarily defeat a recovery. No fixed distance from a crossing, within which a view of the track is unobstructed, can

be adopted as the single circumstance upon which a highway traveler's due care is to be determined. His conduct is to be judged by the standard of the average prudent person under all the circumstances. *Fissette* v. *Railroad,* 98 N. H. 136, 141; *DiPrizio* v. *Railroad,* 98 N. H. 254.

It cannot be disputed that at the time of the accident it was not full daylight. On November 30, 1948, the hour of sunset was 4:13. The day had been clear but with a total overcast at ten thousand feet after two o'clock which had lowered to about five thousand feet by five o'clock. An electric eye at a nearby power plant, designed to automatically set the time for the lighting of street lights, gave its signal at 4:28. The accident could have been found to have happened at 4:45. The exact condition of light at the time was the subject of conflicting evidence. While one witness, who went over the crossing a few hundred feet ahead of the plaintiff, testified that a person approaching the crossing behind him could see a train four to five hundred feet down the track if he looked and other witnesses testified that it was light enough to see without artificial light, both the engineer and fireman stated that it was dark enough so that there would "be danger of an accident" if the lights of the train were not on. This description of the condition of light was corroborated by the flagman who testified that immediately after the accident when he alighted from the train, it was "dark enough . . . for the lights to be on the train" and that lights should have been lighted on automobiles. The plaintiff, when asked on cross-examination if it was light enough so that if he had looked to his right as he approached the crossing and looked carefully he would have seen a train if it was there, answered that he thought so but other answers indicated that his recollections of the condition were far from clear or positive. His testimony concerning this condition contained contradictions and inconsistencies and the jury was free to decide where the truth lay. *Colburn* v. *Normand,* 96 N. H. 250, 253. He was simply giving his impressions as an observer of circumstances concerning which he could have been mistaken. *Harlow* v. *Leclair,* 82 N. H. 506, 512. He has no memory of the accident itself and had no occasion to take any special note of the condition of light before it occurred. Furthermore, the lights of his vehicle were lighted indicating that at some time prior to the accident he had considered it sufficiently dark to require their use. Taken most favorably to the plaintiff,

it could be found that while it was not totally dark at the time of the accident, daylight had faded into dusk sufficiently to require that vehicles be lighted.

It could also be found that as the plaintiff approached the crossing there were one or two lighted vehicles approaching the crossing from the opposite direction. The plaintiff continued toward the crossing at a steady speed and without changing his course in the highway until he was within six or eight feet of the crossing when he veered "a little bit" to his left and the collision occurred. It was also findable that neither the whistle nor the bell of the train was sounded as it approached the crossing and its headlight was not lighted.

Under these circumstances, we cannot say as a matter of law that the plaintiff "either saw the train or took such an inadequate look in its direction that he did not notice it," as claimed by the defendant. The fact that he neither increased nor decreased his moderate speed in the last four hundred feet before the crossing and changed his course in the highway only by veering to the left immediately before the collision is sufficient to support a finding that he either saw the train too late to avoid the accident or never saw it at all. It does not necessarily follow, however, that his failure to observe the train in sufficient time to avoid the accident was caused by his own negligence. In looking for approaching trains, he was required to exercise no more than the care of the ordinary prudent person under the circumstances that then existed. The 152 degree angle at which the road and track met afforded the plaintiff an opportunity to look for the approaching train by a mere shifting of his eyes from the highway but it limited the expanse of train available to his view to little more than the front of the engine. In the dusky condition which could be found to have prevailed at the time, with the lights of his own vehicle lighted as well as those of the cars proceeding towards him, we cannot say as a matter of law that had he looked along the track at any sufficient stopping distance from the crossing in such a manner as due care required he must have been aware of the approach of an engine which could be found to have been unlighted and to have given no signal for the crossing either by whistle or bell. The circumstances of this case differ materially from those existing in the cases upon which the defendant relies (*Bixby* v. *Railroad*, 94 N. H. 107, 108; *Gates* v. *Railroad*, 93 N. H. 179, 181; *Niemi* v. *Railroad*, 87 N. H. 1, 3) in which the conclusion that if the driver had looked he must have seen the train was inescapable.

Throughout the trial, the defendant sought to establish that the plaintiff's failure to see the train was caused by his own negligence, either in not looking as carefully as he should have or in not looking at all and requested an instruction concerning the plaintiff's common law duty to look and to see. In its charge, the Trial Court failed to specifically mention these claims. The instructions related primarily to the statute (R. L., c. 119, s. 18) to be considered in connection with the plaintiff's conduct which required, among other things, that the operator of a motor vehicle approaching a grade crossing should proceed cautiously over the crossing and instructed the jury to decide whether the plaintiff "acted as an ordinary man of average prudence as to his approach to this railroad crossing." By contrast, the plaintiff's common law claims that the engine was unlighted and that no special protection was provided at the crossing were not covered merely by a general statement that the defendant was required to act with due care but were specifically explained as separate claims of acts of omission on the part of the defendant which constituted negligence. If it is reasonably certain that a jury will understand what issues are before them then it may usually be presumed that a general charge as to the duty to use due care is sufficient. *Paradis* v. *Greenberg*, 97 N. H. 173, 176. At the same time, it should be remembered that the charge deals with issues and the rules of law necessary for their determination. *Dane* v. *MacGregor*, 94 N. H. 294, 299. Those issues should be so phrased that it is reasonably certain that the jury understands them. *Davis* v. *State*, 94 N. H. 321, 323; *State* v. *Skaff*, 94 N. H. 402, 407. On retrial if the jury is to be charged as to specific issues raised by the plaintiff it should also be so charged as to those raised by the defendant, lest the difference in treatment accorded to the claims of the parties tend to remove from the jury's consideration issues which are not mentioned but are intended to be submitted.

Before discussing the contested issues of the case, the Court stated in its charge that "the question of speed is not an issue in this case . . . speed, of both parties, was reasonable." Thereafter in discussing the statutory duty imposed upon the plaintiff (R. L., c. 119, *supra*), the jury was instructed that the plaintiff was required to reduce his speed to a reasonable and proper rate and that "If you find that the plaintiff failed to approach at a reasonable and proper speed . . . you must find for the defendant." Possibly the first reference to speed was intended to refer to the plaintiff's rate of travel at some distance from the crossing while the latter

reference concerned his duty upon his immediate approach to it but it appears that the jury could not have reconciled the two statements without further explanation. If upon retrial there is occasion to make this distinction it should be more sufficiently explained.

The testimony of two witnesses who, on occasions other than the day of this accident, had been driving in lighted motor vehicles toward the crossing in question from the west after dark and who had each mistaken the lighted headlight of a train approaching from the east for the light of an oncoming vehicle on the highway, was admitted subject to the defendant's exception. While the circumstances of these two instances were not identical as to time of day and weather conditions with those in the case at bar, there were sufficient elements of similarity upon which the Trial Court could decide in its discretion that the evidence would aid the jury. *Ricker* v. *Mathews,* 94 N. H. 313, 317.

The evidence was offered in support of the plaintiff's claim that the lighted headlight of the train approaching from the east was likely to cause confusion at this particular crossing to a highway traveler from the west, a fact which, if found, would bear on the issue of the plaintiff's own care. The defendant's contention that it was inadmissible on this issue since there was no evidence that the plaintiff was in fact confused is without merit. Confusion is a state of mind and testimony concerning its existence or nonexistence by the plaintiff would have been so peculiarly within his own knowledge as to be binding upon him (see *Harlow* v. *Leclair, supra*). Where such testimony has been made unavailable, as by death or loss of memory, direct affirmative evidence may be dispensed with and the jury, upon competent evidence from which the probabilities may be determined, may decide that fact. *Jones* v. *Railroad,* 83 N. H. 73, 77, 78. While the evidence concerning the somewhat parallel courses followed by the highway and the tracks as they converged from the east, the approach of lighted motor vehicles from the east and the plaintiff's conduct in proceeding at a nonvarying rate of speed almost to the point of collision does not compel a finding that the plaintiff was confused, it might be found sufficient to refute the defendant's basic premise that there was no evidence that the plaintiff was in the exercise of due care. The statements of the plaintiff that he never saw the train, taken in their proper context, were simply assertions that he did not remember. This did not preclude his

reliance upon the evidence that the headlight of the train, if lighted, would tend to confuse him.

Other exceptions of the defendant have not been considered as the matters with which they are concerned are not likely to arise on retrial.

*New trial.*

All concurred.